## Case No. 14,918.

### UNITED STATES v. DARNAUD.

[3 Wall. Jr. 143.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1855.

SLAVE TRADE — ELECTION OF FELONIES — OWNERSHIP OF VESSEL — CITIZENSHIP — DISCHARGE OF SWORN JUROR — PRIVILEGE OF WITNESS — CUSTOM HOUSE REGISTRY — COMPARISON OF HANDWRITING.

1. In a prosecution under the act of May 15, 1820 [3 Stat. 600], for suppressing the slave trade, the act of receiving negroes on the coast of Africa, and of confining and detaining them on ship-board, and the aiding and abetting in confining, form one transaction, and may therefore be joined together in the indictment and prosecution, under different counts; but the selling and delivery of the negroes at the termination of the voyage, as on the coast of Cuba, seems to be a distinct transaction; and if this felony is charged in the same indictment with the other, the prosecution will be made to elect on what counts it will proceed.

2. Ownership of the vessel by a citizen of the United States, if the accused be not, himself, a citizen; or citizenship of the accused, if the ownership be not by such citizen, is an essential ingredient in maintaining a prosecution under the fourth and fifth sections of the act above named.

3. Citizenship, within the meaning of this act, is not what may be called citizenship of domicile, nor is it such citizenship as has been claimed by diplomatic assertion under our naturalization laws, for one who has formally declared his intention to become a citizen, without having proceeded further. But it is that citizenship which has a plain, simple, every-day meaning; that unequivocal relation between every American and his country which binds him to allegiance and pledges to him protection.

4. The custom house registry of a vessel, under the acts of congress, as a vessel of the United States, prior to which registry an oath must be taken by the person in whose favor it is made, that he is true and only owner, and a citizen of the United States, is evidence of her national character within the meaning of the acts of congress; and of the character under which she publicly appeared and acted; but in a criminal prosecution against a third person, it is very slight evidence indeed—if it be evidence at all—of the real fact of ownership, and whether or not the ownership be in a citizen of the United States. The case of U. S. v. Brune [Case No. 14,677], very slightly qualified, perhaps, but substantially confirmed and its correctness enforced. In such a prosecution the ownership must be proved distinctly, and as other facts are proved, by common law testimony. Purchasing the vessel, paying for her, repairing her and fitting her for sea, bargaining and paying for her ship stores, procuring her pilot, and shipping her crew, all these are proper evidence of ownership, as they also are, if ownership is disproved, that the vessel was navigated for or on behalf of the person doing these acts. But if in direct connection with these acts and alongside of them, it is proved as a fact that the funds which this person was using belonged to a third party, not a citizen; that he had no funds of his own, that he spoke of himself as an agent and was recognized as such by the banker who put him in funds, and by the third person whose funds they were—all this, which is proper evidence—is evidence to show that the ownership was not in a citizen but in a foreigner: and so far to defeat the prosecution.

5. It is irregular for the court to instruct the witnesses generally, or even a single witness generally, that they were not bound, in answer to questions which might be put to them. to make any answers which would criminate themselves. The proper way is to wait until a question is asked, which, if answered in one way may criminate the witness, and for the court then to interfere.

6. Whether two or more signatures, which purport to be the signatures of different persons, are or are not written by the same person, is a proper subject of proof by an expert; though the testimony of an expert on such a subject is a dangerous kind of evidence.

A law of congress (Act of May 15, 1820, c. 113, §§ 4, 5 [3 Stat. 600]), designed for the suppression of the slave trade, enacts by one section, "that if any citizen of the United States, being of the crew or ship's company of any foreign vessel, engaged in the slave trade, or any other person whatever, being of the crew or ship's company of any vessel, owned in whole or in part, or navigated for, or in behalf of any citizen or citizens of the United States, shall land from any such vessel, and on any foreign shore, seize any negro or mulatto, with intent to make such negro or mulatto a slave, or shall receive such negro or mulatto on board any such vessel with intent as aforesaid, such citizen or person shall be adjudged a pirate; and suffer death." And by another, enacts that if any such person shall forcibly confine or detain, or aid and abet in forcibly confining or detaining on board such vessel, any negro or mulatto, with intent to make such negro or mulatto a slave, or shall land, or deliver on shore, from on board any such vessel, any such negro or mulatto, with intent to make sale of, or having previously sold, such negro or mulatto as a slave, such citizen or person shall be adjudged a pirate; and suffer death. Under this law, Darnaud, the prisoner, who had been engaged in a slaving voyage on the Grey Eagle, was indicted. The indictment contained thirty-nine counts. The defendant's citizenship and the national character of the vessel were properly alleged. And five distinct charges were made in the bill: (1) Receiving negroes on board the vessel on the coast of Africa; (2) confining and detaining on board the vessel; (3) aiding and abetting in confining and detaining on board the vessel; (4) delivering on shore at Cuba from on board the vessel, having previously sold; (5) delivering on shore there from on board the vessel, with the intention of selling.[2]

One Marsden, of New York, a principal character in the case, and about whose American citizenship there was no doubt, was alleged in the indictment to be the person who owned the vessel when she was thus engaged, or if not the owner, then the person on whose account and for whose benefit she was navigated.

The prisoner having pleaded not guilty, and Mr. Vandyke, the district attorney, having opened his case, C. Guillou and R. P. Kane, counsel of the prisoner, referring to several authorities,[3] moved that the prosecution should be made to elect on which of the counts

---

[2] Slave vessels sail with two or three, or four captains. One captain clears her in a United States port, and swears he is an American citizen. Another, belonging to a different country, in connection with the first, when she arrives at the coast of Africa receives the slaves on board. Another, after the slaves are received, takes charge of them and commands the vessel, and makes one of the former captains the doctor, mate, steward, or something else. Another delivers the slaves on shore. This is done in order to enable the vessels to seek the protection of a flag which the cruiser hailing them will, under the treaties between different governments, respect and regard. If a vessel of this nature happens to be chased by a British cruiser. the practice is to run up the American flag; the American captain shows himself with his American papers, and the cruiser goes off without boarding. When an American cruiser comes in sight, the Portuguese or Spanish flag is run up, and the false Portuguese or Spanish papers are produced. In the present instance, when a British cruiser hove in sight, the American flag was run aloft and the American papers were ready to be shown, and when that flag was seen the cruiser went off. It was on these accounts that the indictment charged the prisoner in this separated way, (1) with receiving; (2) with confining and detaining on board, &c. The counts were essentially as follows:.

Eleven counts. from first to eleventh. inclusive, charged the defendant with receiving on the coast of Africa on board a vessel called the Grey Eagle, negroes not held to service or labor, with intent to make slaves of them. The counts were drawn in various forms. Twelve counts, from twelfth to twenty-third, inclusive, with confining and detaining negroes on board the vessel Grey Eagle, etc., in various forms. Three, from twenty-fourth to twenty-sixth. inclusive. with "aiding and abetting" in confining and detaining in various forms. Six, from twenty-seventh to thirty-second, inclusive, with delivering on shore from on board vessel, with the following variations: Twenty-seventh charged vessel as owned. wholly and in part, by a citizen and citizens unknown, and also charges the intent of defendant to sell said negroes as slaves. Twenty-eighth charged vessel as owned by a citizen, with intent to sell. Twenty-ninth charged defendant as master of vessel owned by a citizen unknown. intent being to sell. Thirtieth charged defendant, as one of ship's company, with delivering at the Island of Cuba, negroes from vessel owned wholly and in part by a citizen and citizens, having previously sold such negroes as slaves. Thirty-first charged vessel as navigated for a citizen and citizens. and that negroes had previously been sold. Thirty-second charged vessel owned wholly and in part by a citizen and citizens unknown, did on high seas deliver, &c., having previously sold. Thirty-third charged that defendant was a citizen, one of ship's company, of a foreign vessel and did receive on board five hundred negroes. said negroes having been seized on a foreign shore. with intent to make slaves of said negroes. Thirty-fourth, that defendant on high seas. being master of vessel owned, in whole and in part, by citizen and citizens, did receive on board, a number of negroes, who had been seized on a foreign shore. Thirty-fifth, that defendant was a citizen, and one of ship's company, of foreign vessel and did confine and detain a number of negroes, with intent to make them slaves.

[3] 1 Chit. Cr. Law, 253; Whart. Cr. Law, 150; Com. v. Hope, 22 Pick. 1; Young v. Rex, 3 Term R. 98; Weinzorpflin v. State, 7 Blackf. 186; Wright v. State, 4 Humph. 195; People v. Baker, 3 Hill, 159; Harman v. Com., 12 Serg. & R. 71; Com. v. Gillespie, 7 Serg. & R. 476; State v. Nelson, 29 Me. 329.

it would proceed; arguing that now was the proper time for this application, which if not allowed here could not be allowed hereafter in the shape of error, or in arrest of judgment. They contended that the indictment contained at least four distinct felonies: (1) Receiving the negroes on board the vessel; (2) confining and detaining them on board; (3) aiding and abetting in confining and detaining; (4) delivering on shore from on board the vessel. They were not part of the same transaction, nor were they distinct misdemeanors, merely part of one felony. Each was a distinct felony, alike punishable with death, nor was one an ingredient of the others.

Mr. Vandyke. The application is out of time. If the indictment charged distinct felonies, a motion should have been made to quash before plea pleaded. Having pleaded, the defendant should wait till the prosecution has closed its case. A joinder is allowed even by the common law in regard to all parts of the same transaction. But if it were otherwise, the act of congress of February 26, 1863, provides that "whenever there are or shall be several charges against any person or persons for the same act or transaction, or for two or more acts or transactions connected together, or for two or more transactions of the same class of crimes or offences, which may be properly joined, instead of having several indictments, the whole may be joined in one indictment in several counts; and if two or more indictments shall be found in such cases, the court may order them consolidated." The words "which may be properly joined" do not refer to all the clauses that precede them, but only to the clause "two or more transactions of the same class." This is a statutory felony; and all the acts charged, even if each one is a felony, are parts of the same transaction, or acts or transactions connected together, and are properly joined.

Before GRIER, Circuit Justice, and KANE, District Judge.

GRIER, Circuit Justice. The transaction on the coast of Africa is one matter which may be charged in all the forms it will bear. The receiving of the negroes there, the confining and detaining of them, and the aiding and abetting in confining and detaining, form one transaction, though they are different offences. They may therefore be joined together. It might also in the same connection be charged that the act was done by a foreign citizen in an American vessel, or an American in a foreign vessel. Besides, the vessel might be charged as belonging to A. or B., or persons unknown. These are all parts of the transaction. The indictment, however, goes further, and charges the selling and delivering of negroes on the coast of Cuba, which forms a separate and distinct transaction. I am unwilling to say that the receiving, detaining, aiding and abetting in these acts, the man being an American, or being not an American;

the vessel being an American vessel, or being not an American vessel, belonging to A., B., or C., or to people unknown, may not be allegations of the same transaction. But I think, as at present advised, that the selling and delivering of slaves on the Cuban coast is a distinct transaction. If the defence asks me to say more than this, I am not at present disposed to do so. But whatever may be the election of the prosecuting officer, he has a right to bring out the whole history of the matter as part of the res gestæ.

Mr. Vandyke, under this expression of opinion, then elected to try on those counts which charged with receiving on board and confining and detaining, and aiding and abetting in confining and detaining, striking out all which charged with crime on the coast of Cuba.

The Grey Eagle was an American built vessel; and had been owned by seven or eight American merchants engaged as partners in the pearl fishery. One Hollingsworth, of Philadelphia, a reputable merchant, was managing owner, and to him alone, as such, the vessel had been transferred by bill of sale, he taking an oath at the custom house that he was "true and only owner;" an oath required by law to be taken by a person when he is true and only owner; but not the proper oath where others are in any way interested with him. The pearl fishery proving unsuccessful, Hollingsworth gave orders to a house in New York to sell the vessel. Marsden called on them and inquired as to the terms of sale. The price fixed was $10,000. Marsden did not wish to give that amount for her, and he was told that he might go to Philadelphia and deal with the owners. He came to Philadelphia, saw Mr. Hollingsworth, and concluded a purchase of the vessel for $9,100, and took her to New York. The bill of sale from Hollingsworth to Marsden was dated March 4th, 1854. Marsden of course with that bill of sale took the register, which had been issued at the port of Philadelphia to Mr. Hollingsworth. A pilot took her to New York and delivered her to Marsden.

Previous to the arrival of the vessel at New York, Marsden employed a rigger to rig out the vessel. She arrived there, of course, some time after the 4th; the register and bill of sale were not deposited in the New York custom house until the 20th of March, but in the meantime the vessel arrived there, and Marsden, with two or three others, commenced the active preparation of the vessel for a voyage. Marsden employed the rigger, the carpenter, and sailmaker; bought the coppers which were put on board the vessel for cooking purposes; purchased 28,000 pounds, upwards of 10 tons, of rice; 12 or 14 barrels of beef, and half the number of pork; 24,000 gallons of water; in

short he, and he alone, had the vessel prepared for the voyage. He engaged the shipping master to ship the crew, in part by himself and in part in connection with the defendant. And thus on the 20th of March had the vessel partially prepared. He then deposited in the custom house the bill of sale from Mr. Hollingsworth to him, and surrendered the register.

Things remained in this way until the vessel was ready for clearing, which was not until the 25th of March. A majority of the bills which were incurred had not up to the time of clearing been paid by anybody. After she cleared, two or three of the parties having bills, went to the office of one Oaksmith, where Marsden had a desk for the purpose of conducting his business, and there received their pay. Some of them were paid by one Machado, hereafter mentioned.

The vessel, by the agency of Marsden, and by the assistance of Darnaud, who took part in receiving the stores on board, was ready on the 25th of March to be put afloat. At this juncture Marsden employed a broker to make a bill of sale to a person called Samuel S. Gray, and it was done. The register bond in the custom house is regularly signed by some person representing himself as Samuel S. Gray, in which signature the prisoner joined as master of the vessel. The law requires the master to make oath that he also is a citizen of the United States; and all the custom house proceedings and papers assume that he has done so, and that he is one. But for some reasons not properly explained, it appeared that at about this time the officers of the New York custom house violated their duty in this respect; not exacting this oath from masters. In the bond, which was signed by Darnaud, as master, Gray alleged himself to be a citizen of the United States. The broker procured a respectable man as surety, who did not know who Samuel S. Gray was, but went security simply because Marsden requested it, through his agent.

The vessel cleared with those papers, which the prisoner, as captain, was by law bound to take with him; but previous to the clearing, it went through another usual transaction—the shipping of the crew. A crew is shipped in this way: A shipping master is generally the agent of the owner, as well as the agent of certain boarding house keepers who have crews to ship. He opens a shipping office, and sailors go to him and sign the shipping articles, a large printed document prepared in accordance with an act of congress. Some of the sailors make their marks, and some write their names in such a way as to be illegible. This paper is not taken with the ship. It is sent to the custom house and is there deposited. This crew list has appended to it the oath of a notary public that he has received sufficient proof of the American character of the vessel and of the crew named on the shipping list. The law also requires that the owner or master shall deposit a copy, under oath, of these shipping articles, which shall be sworn to by the master before a notary public, as a true and exact copy of the original paper. Of this paper, which is deposited in the custom house, the master takes a copy certified under the seal of the collector. That copy goes with the vessel and forms the paper which is contemplated in the crew bond, and in relation to which the bond is given. All this was complied with. One Pentz, was employed by Marsden to ship the crew for this vessel. After the vessel had sailed, Marsden called and paid Pentz for the shipping of the crew.

Who the Samuel S. Gray was did not at all appear. Marsden was not forthcoming. Nobody identified Gray; nobody knew him. The position of the prosecution was that the transfer from Marsden was a mere fraud; a device to get Marsden's name as owner from off the custom house registry. And the position therefore taken was that Marsden was still owner in whole; or in part with Machado.

On the other hand there was verbal evidence of people's belief that Marsden was a man of no property when he made the purchase and outfit, and evidence of the fact that all the funds came to him from one Machado, of New York, a Spaniard, naturalized here, as the prosecution proved by the production of his papers, and who in this matter, was, as appeared by his own oath, merely the agent of another Spaniard not naturalized, one Rivero, who he said had placed the funds in his hands. Who this Rivero was did not appear at all; nor was he shown to be a man of property. He had been on board the vessel during her voyage to Africa, as one of her two or three captains; but beyond this (see supra, note 2); nothing whatever appeared, Rivero had no written evidence of ownership, so far as appeared; nor was his ownership shown in any way but by the mere fact that Marsden and Rivero had told this Machado (so he swore), that he, Rivero, was owner of the vessel, and the fact that Machado received and paid the funds as Rivero's; doing it sometimes in a pretty loose way. How Marsden was paid for any of his services was not shown by anybody. That most if not all the funds which Marsden used in the matter passed through Machado's hands, was plain enough; but Machado's books were relied on by the prosecution to show that all this was but a form; and that, in part at least, the funds belonged to Marsden, or to Machado, or to both.

So far as concerned the citizenship of the prisoner—a matter important only in case the vessel was really not owned by an American—it appeared that this person was a native of France, and came to this country twelve or fourteen years before this voyage; that he then represented himself as a French-

man, as he also did when arrested under the warrant in this case; that he could speak little or no English, when he came here; that he lodged at French boarding houses, associated with French people; and when applying for a place on an American vessel was asked how he expected to get the place when he could speak nothing but French. On the other hand, he appeared to have in fact renounced his own country; had hailed for twelve or fourteen years as from the United States; had never used an American protection when shipping for foreign ports; had represented himself in fact, if not positively sworn, at the custom house, that he was a citizen of the United States; and had acted as captain of a vessel which he knew was registered as American; a privilege allowed by law to American citizens only.

Mr. Vandyke, for United States, to the jury:

The owners of vessels about to engage in the slave trade being certain of prosecution as pirates if discovered, and of the penalty of execution if convicted, make. invariably, and from the origin of their enterprise, arrangements as complete as possible, to defeat all prosecution. The highest efforts of their ingenuity, sharpened by experience of criminal courts, as to what is needed, are brought into action for this purpose. The arrangements consist in a substratum of agents and of foreigners and of men ready to swear to anything; all at first invisible; but in case of a prosecution to be projected upon the scene. The real actors are Americans; and so long as they are not overtaken by the justice of the Nation, we hear of no other actors in the enterprise. No foreigners, no false custom house oaths are necessary. But when a criminal is seen, then the stalking horse comes into view to hide him. The false fabric is raised to shut out from view the true one. All that was pre-arranged for the rear ground—agencies, foreigners, perjury—comes forth complete in every. part.

In an indictment for slave stealing, the jury ought to look at facts rather than any testimony not clearly pure. That perjury will be committed by witnesses of the defence is certain. Pre-arrangements are made for perjury in all slave voyages. Unless this slave voyage is unlike every other, and an exceptional case merely, a matter not to be presumed, there will be, as of course, witnesses at hand from the start to show that the ownership is a different one from that which appears, had been sworn to and universally believed.

When, therefore, the jury sees an American citizen acting from beginning to end as owner; with all the muniments and indicia in his own name—treating, buying, rigging, equipping, shipping crew and sending out of the harbor a vessel which he swears is his alone; when in a most dangerous enterprise he declares himself from the beginning to the end of the enterprise to be owner; when the man who is now set forth as owner—a foreigner—a man confessedly engaged in cheating our government and in carrying on under false pretences an illegal and infamous traffic—cannot show that he ever had one written evidence of ownership, even of the most secret kind against an American, a stranger to him, a man of worse character even than himself; when the whole evidence of the Spanish ownership rests not upon even a secret written agreement, but rests on one Spaniard's or his clerk's testimony of what these two infamous characters once told him; and upon the simple fact that the money with which the ship was bought passed through his hands as the money of a foreigner—in such a case, on an indictment where that exact kind of evidence is almost certain to come forth, no matter what the truth may be, then, in such a case, the jury should look at facts, as much more likely evidence of truth than oral testimony. I mean of course. than such oral testimony. Had Marsden died, to whom would this ship have belonged? Living or dead, what evidence had Rivero of ownership against Marsden, or against anybody? This is not the way in which merchants—Spanish slave merchants—deal, and is irresistible to show a lie, ex post facto. Marsden is said to have had no property. One witness believes so; knowing little about him. What evidence is there that Rivero had property either? Who is Rivero? He was no merchant. He was one of the captains of this voyage. Where did his property come from? Concede that he put money in point of fact into Machado's hands, and had the semblance of property. Marsden, as apparent owner of the vessel, had much better semblance of property. Who put the money into Rivero's hands? Let them show that. Was it American or was it Spanish capital? Let them show that. Rivero was a mere figure in the case; and used because he was a Spanish figure. How was Marsden paid? Let that be shown. Did he receive commissions? Or had he an interest as part-owner in the voyage? If he was a mere agent he received some compensation in money. Has an attempt been made to show that he received anything in that way? The inference is irresistible that if not owner by original purchase, he was paid by an interest of some kind in the voyage; and that the vessel in part was navigated in his behalf. That is enough. It is a matter of no importance how small may have been the interest which Marsden, or Machado, or any other American citizen may have had in the vessel; if one farthing, it is sufficient, because it is a part of an interest in the vessel. If from all the circumstances of the case as brought before us, as to the parol and paper title and the circumstances under which the vessel sailed, we should believe that any person belonging to this Nation had an interest in the vessel,

we are relieved from all difficulty, so far as the point of jurisdiction is concerned. Nor does it matter whether that interest be a legal or equitable one, whether it appear upon the face of the paper title, or has been covered up in fraud, to be inferred from the circumstances of the transaction, with the view of avoiding the responsibilities imposed by congress on those engaged in this unnatural and wicked traffic. If any person was so prominent in the management of the business connected with this vessel as to lead one to suppose that he owned it wholly or in part, it is enough for the purposes of this cause, even though his interest may have been attempted to be covered up and secreted, so that he might screen himself behind the responsibility which rested on the shoulders of all those engaged, and which now rests upon the shoulders of this unfortunate defendant, a fact which may be proved directly or indirectly, or which may be inferred from all the circumstances surrounding the transaction, just as we would infer any other conclusion to which our minds may be led upon a subject of fact involved in any cause. And all that is said in regard to the question of ownership, is applicable to the other question raised by the act of congress, whether—the ownership being foreign—the vessel was navigated for or in behalf of a citizen of the United States.

Then finally, supposing the Spaniard, Rivero, was owner, and that the vessel was not navigated in any way in behalf of any citizen of the United States, was the prisoner a citizen? The term citizen is capable of more meanings than one. Darnaud has renounced his country: he hails from here as a citizen. He is captain of a vessel registered as American; which under our laws presupposes citizenship in him. He has, no doubt, sworn that he was a citizen. The notary public certifies him as such: His domicile is here: Letters of naturalization are not necessary to convert a foreigner into a citizen in all meanings of the term. In the well known case of Martin Koszta, our government interposed and protected as its subject and citizen, against European monarchs, a man who had merely declared an intention of becoming a citizen. The word citizen has therefore other meanings than the one which it has under our naturalization laws. A man may be a citizen who is neither born here nor naturalized. The court will instruct you on this subject. But when a man enjoys peculiar privileges of citizenship, and renouncing in fact—much better than renouncing in form—his own country, adopts another as his home, it seems but natural that he should be deemed a citizen of that other, so far at least as to make him amenable to its laws, when they punish its "citizens" who engage in a traffic denounced by the voice of nearly every Christian nation of the earth.

C. Guillou and R. P. Kane having replied, the charge of the court—Judge GRIER, who had been present during most of the trial, being now absent—was thus delivered by:—

KANE, District Judge. The thirty-nine counts of this indictment are included in two general propositions. The first, that the accused, being one of the ship's company, of a vessel which was at the time owned or employed by a citizen or citizens of the United States, did receive or did detain on board one or more negroes, with intent to make slaves of them; or that he did aid and abet others in doing so. The second, that the accused did some one or more of the acts, which are charged and as I have recited them, on board of a vessel; no matter by whom owned or employed; he being a citizen of the United States.

The first class, regarding his own national character as of no consequence; but making the character of the vessel, the national ownership of the vessel, the national character of the owners of the vessel, an indispensable criterion; the second, disregarding the nationality of the owners and employers, but fixing itself upon the national character of the captain, or member of the ship's company, represented by the defendant.

I have to say to you, in the first place, that every one of the elements of the charge, as I have recited them before you, must be proved by the United States before they can claim a verdict of guilty. That is to say: the United States must prove, that this accused prisoner was one of the ship's company of a vessel, which was at the time owned or employed by a citizen or citizens of the United States, and that he then and there received and detained on board one or more negroes with intent to make slaves of them; or did aid and abet others in doing so. Or else, the United States must satisfy you, that the defendant, being himself a citizen of the United States, did one or the other of these acts on board a vessel, without regard to her ownership, upon the high seas.

Among the elements which alternatively constitute the crime, is the citizenship of the accused, or that of the ship's owner. It is not merely a question of jurisdiction in the view of the court, according to the ordinary use of the term. It is a question of the essential elements of the crime. The offence is a statutory one. It not only describes the place where the offence may be committed, and the circumstances which shall go to make the offence, but it defines the persons who alone are capable of committing it. And the statute is as inapplicable to other persons as it is to other places or to other acts.

There is good reason for this, a reason sufficiently obvious. Every nation has absolute jurisdiction of crimes committed within its own territory; and may make whatever laws it chooses, declaring what acts shall be crimes if committed there. But no nation can legislate for others. And as the high seas are the common territory of nations, those laws only

which all nations recognize are the laws of that common territory by which all men are bound. No state can any more legislate for the high seas, than a corporator can legislate for the corporation of which he is a member, or an individual citizen for the county or state in which he lives. No nation can make or enforce special laws for the high seas, without infringing upon the rights of other nations. It was an effort on the part of England, like this, to declare what should be the law affecting neutrals, third persons, individuals of other nations, which led to our war of 1812. It was an effort on the part of France, to prescribe what should be the muniments of title borne by American vessels on the high seas, which embroiled us in hostilities with that country in the early part of the present century. It was an attempt of the same sort, or in the same spirit, by Spain, by Denmark, and by other foreign powers, which at different periods led to reclamations, stern and in the end successful, on the part of the American government, for the damage sustained by American citizens by reason of acts of unauthorized jurisdiction.

In a word, no state can make a general law applicable to all upon the high seas. Where an act has been denounced as crime by the universal law of nations, where the evil to be guarded against is one which all mankind recognize as an evil, where the offence is one that all mankind concur in punishing, we have an offence against the law of nations, which any nation may vindicate through the instrumentality of its courts. Thus the robber on the high seas, the murderer on the high seas, the ravisher on the high seas, pirates all of them, recognizing no allegiance to any country, because the very act violates their allegiance to all their fellow men, if caught, may be punished by the first taker. And so too, if the nations of the so-called civilized world, who are fond of calling themselves the whole world, and of arrogating to themselves somewhat too readily all the rights that belong to the whole world, could for once unite in defining that some one act should be regarded as a crime by all, it may be that after such an agreement by all the world, the courts of any one nation might without reference to the nationality of the individual undertake to punish the offence he had committed.

But so soon as we leave these crimes of universal recognition, the jurisdiction of a state over the acts of men upon the high seas becomes circumscribed. It is no longer an exponent of the law of individual or international morals. The owner of a farm cannot legislate for the highway, however conscientious or wise he may be. All the jurisdiction which any nation exerts, or can properly affect to exert upon the high seas, except as the representative of the general sense of mankind, declared in the general law of nations, is founded on the control which every nation has over its own citizens, and their conduct wher-

ever they may be found, or over the acts of others who for the time have subjected themselves to our jurisdiction by accepting the protection of our flag. If you or myself, entitled to the protection of our country, and with our country pledged to defend us wherever we go, not having yet passed within the territory of a foreign sovereign, but being on the common highway of nations, violate the laws of our government, we may be punished for violating them. And if we, being citizens owning vessels under the American flag, entitled, therefore, to protection as American vessels, engage others, whether foreigners or citizens, to be our voluntary associates in violating the laws of our country, and they are caught violating them upon the common highway of nations, they may be brought here and punished.

But it is only in the two cases, where the individual accused is himself a citizen, whose allegiance to his government continued while he was upon the common highway of nations, or where the property upon which the individual was found perpetrating a wrong was property recognized as American, owned by Americans, it is only in these two cases that the United States can make a law which would be binding upon all citizens or which could be enforced by courts of justice; and I do not hesitate to say, after something of mature consideration, that if the congress of the United States, in its honorable zeal for the repression of a grievous crime against mankind, were to call upon courts of justice to extend the jurisdiction of the United States beyond the limits I have indicated, it would be the duty of courts of justice to decline the jurisdiction so conferred. It is for this reason, then, that our government, in denouncing guilt, and punishment against acts like those charged upon this prisoner, denounces acts done by American citizens and by persons sailing under the sanction and auspices of American citizens on vessels owned by American citizens or in their employ.

That the offence is called in our particular statute piracy, does not vary the legal position and consequences of the case. Piracy is essentially an offence against the universal law of the sea. It assumes that the individual has thrown off his allegiance to mankind. He is the enemy of all who meet him. The slave trade, however horrible it may be, is not within that category. It has been recognized as lawful for many centuries by all the nations of the world. It is only within a few years, within the memory perhaps of every one whom I am addressing on the jury, that the first declaration was made by national authority that it was a crime. And up to the present moment there are nations professing to be civilized. Christian nations, that have refused peremptorily to unite in so recognizing it. It is not, therefore, piracy—such a piracy, no matter whether so called in our acts of congress or not—not such a piracy as constitutes a man the enemy of his race, and con-

fers upon every court of justice in every land the right to try and punish him for his acts. It is no further unlawful in the estimation of courts, it is no further unlawful in the estimation of jurors, considered as jurors, whatever it may be in the estimation of all of us as men and as Christians, than as it is distinctly declared by the laws of our own country to be prohibited to you and myself.

The element, therefore, of citizenship in the description of the crime, on the part of the ship's owner and of the master or member of the ship's company, is an essential condition and element of the crime with which this prisoner is charged; and it must be proved as such, or the accused cannot be convicted here.

Having said this, I have nearly got through with the legal propositions that have a bearing upon the case. I come to the consideration of questions of fact—questions peculiarly for you to decide; and in regard to which I desire to go no further than to gather together from my memory those portions of the evidence which bear upon particular points.

First, then, was this vessel owned by an American citizen, or navigated for or in behalf of an American citizen or citizens, at the time of the acts charged in this indictment? In the first place she was American built, and her American character remained unchanged, of course, until in some way or other, she was divorced from it. It remained unchanged, when Mr. Hollingsworth, acting on behalf of a company of gentlemen, but acting in his own name, purchased her, and took out her register in his own name—all those gentlemen being American citizens. She was at that time a vessel owned by American citizens. Those citizens, through the instrumentality of Mr. Hollingsworth, sold her to Marsden, for the time being of New York, and a citizen of the United States, who paid for her and took title in his own name; whether as sole owner, or whether like Mr. Hollingsworth, owner with others, or whether as agent or representative of others, without personal interest on his part, does not appear.

It is to be lamented, and it may be a subject of lamentation not only among moralists, that the preliminaries of title which are prescribed by our laws, and which exact the solemn oath of the party as to the nature of his title, the extent of it, and the number and names of his associates in the purchase, and that the consequent records of title to American ships, are so often irregular and erroneous. You have had a single instance of it, in the case of a gentleman of unimpeached honor in our commercial circles, who makes or rather signs at the custom house a formal oath, that he is the sole and exclusive owner of the vessel, when, in point of fact, it was altogether otherwise; when he was neither the sole nor exclusive owner, but only one of six or seven or eight owners.

The title, the paper title, as between the persons who have themselves taken part in its fabrication, may be regarded as conclusive against them; that is to say, that if you, sir, have executed a bill of sale in my favor, and permitted me to take the register in my name, you shall not be permitted to deny afterwards that you had sold the vessel; and if I accept from you a bill of sale, and go and take out the register, and hold it in possession, I shall not hereafter deny that you sold me the vessel. So far the register may with safety be received as evidence of the transaction. But to say that the execution of a bill of sale by you to me, the surrender of the register by you, and the issuing of a new register in my name, is to be given as evidence against our learned friends who have argued this case before us, who neither could have known nor prevented what we were doing, who had no opportunity of interfering with us, who, if they knew that the whole transaction was a spurious one, an imaginary sale, intended merely as a disguise, and had gone into the custom house to protest against it, would not have been even listened to; to say that they should be bound by what we had done, would be to say that their rights would be at the mercy of our discretion, integrity and honor.

Still, the title, the apparent title, passed from Hollingsworth to Marsden; and it had something more of strength than would properly attach to its paper character, inasmuch as Marsden paid his money before he took it. And thus, at first glance, and till something was shown to the contrary, we should have reason to believe that he was the owner; and he being an American citizen, the vessel continued the property of an American citizen, after passing into his hands. Had, then, the case rested here, it would have been proper for us to require some directness of proof from the parties who should undertake to deny the American ownership of the vessel.

But the United States do not stop here. After showing the title of Marsden, they go on to show that the title, the paper title, the bill of sale title, the register title, passed afterwards to Gray. He, also, is alleged to be a citizen of the United States on the face of the papers. And thus the paper title, upon which, so far as it was worth anything, Marsden's ownership rested, passed altogether by the transfer of that same paper title to another man, described in like terms as a citizen of the United States.

But it is asserted on the part of the United States, that although some one in the name of Gray went through all the formalities at the custom house in the authentication and record of the bill of sale and in procuring the register, yet that this Gray was never the owner at all; and in thus asserting that Gray was never the owner, the United States denounce the truth and efficiency of that title to ownership which is disclosed by the papers of the custom house.

Passing, then, outside of the paper title, the title according to the custom house, whose records have only conducted us into a difficulty from which they fail to relieve

us, how stands the fact of ownership? Who was it that did own this vessel? The defendant says Marsden never owned it, just as the United States say Gray never owned it; and both of the paper titles being thus impeached, we must seek for the real ownership in the other evidence that is before us. How stands that evidence?

We had the cotemporary declarations of Marsden, that he bought the vessel and was fitting it out not for himself, but for a Spaniard named Rivero. We had also the declarations of Rivero, that Marsden had bought for him. We had the evidence of a witness called by the United States, Mr. Oaksmith, that Marsden had no means of his own, wherewith to buy the vessel; and we have the evidence of Mr. Machado, and of his clerks, one of them, if not both, that the funds disbursed by Marsden in the purchase of this vessel belonged to Rivero. I am not aware that there is any other direct evidence going to show whose funds purchased that vessel.

If you are satisfied from what the witnesses have said here, that in truth and in fact Marsden was not a man of adequate means to purchase this vessel; that he bought the vessel for a Spaniard, with funds obtained from that Spaniard; that Spaniard declared that the vessel had been bought for him; that he accompanied and controlled Marsden while the vessel was getting fitted out, and directed his correspondent and banker to make advances to Marsden from time to time for the payment of bills, the court says to you, that in the absence of some proof to the contrary, you are called to believe that Marsden was not really the owner of the vessel, but only the agent for the purchase. It is unnecessary for the court to say to you, conversant as some of you are with the everyday transactions of a business community, that the largest mercantile dealings are conducted and concluded in the names of brokers and agents, without declaring the names of their principals; and that large funds are every day in the year put in the hands of agents to negotiate the purchase of ships and cargoes, without an indication that there are third parties interested in the purchase.

On the other hand, to contradict these assertions you have the examination of books of account of Mr. Machado and of Marsden, the collation of entry with entry, and the argument ingeniously and very powerfully pressed by the district attorney, that the books show these stories to be false; that Marsden was really a man of adequate wealth; that Rivero never did buy the vessel; that the purchase was never made for him; that the funds which Marsden got from Machado were not Rivero's funds, but were Marsden's own, or Machado's own, or that at least they were not Rivero's.

You are to judge then, gentlemen, upon all the evidence; I make no further comment

upon it, so far as regards this point of the case; whether the funds and ownership in point of fact—not according to the paper title, for that paper title fixes it on Gray—but whether the ownership in point of fact was in Marsden, or Rivero, or Machado, or any body else. You are to say whether Marsden's disbursements were of his own funds; whether he was in whole or in part the real beneficial owner of this ship; or whether it was Rivero or some one else who bought and owned her. If it was Rivero for whom Marsden acted, whose funds he disbursed, for whom he bought and held, then this vessel was not a vessel belonging to an American citizen, or navigated for or on behalf of an American citizen.

I feel the more confidence in putting this point to you strongly and clearly, because I see that were a different doctrine to be held by our courts, there would be scarcely any protection whatever against the arts of slave-traders. If the paper title, the formalities of the custom house, the record of the bill of sale, and the issuing of the register, indicated what was the ownership of the vessel, no one American, base enough to engage in the slave trade, would ever be found on board a vessel with an American register, or an American bill of sale. However American her ownership in fact, she would be sold to some Rivero, or some anonymous Portuguese; the Portuguese flag would be hoisted, and the American owner stepping on board would exult under the protecting fraud of an alien flag, and a fabricated bill of sale.

I instruct you, gentlemen, that the law does not regard the semblance, but the fact. Was this vessel in truth, owned by American citizens? If there was a mask, tear it off, and look at the reality. Did this vessel belong to the man who was on board, the Spanish captain as he was called, or did she belong to an American citizen?

Passing then from this point, I come to the other category under which the different counts of the indictment arrange themselves; merely reminding you that unless you are satisfied beyond a reasonable doubt, that this vessel at the time belonged to an American citizen in whole or in part, or was navigated for or on behalf of an American citizen, then all those counts of the indictment in which the charge is made, that the vessel was so owned, are not proved, and your verdict as to them must be not guilty.

Of all the charges in this second class, it is an essential element, that the accused was a citizen of the United States at the time of the acts. You have heard some discussion as to the meaning of this term, citizenship of the United States. It has a plain, simple, everyday meaning; and that meaning you may safely take without a definition. It is that unequivocal relation between every American and his country which binds him to allegiance and pledges

to him protection,—that goes with him wherever he goes, stamping him a traitor if he be found in the ranks of an enemy, as a criminal if violating her laws; but watching over him, and covering him with the shield of her power, though he traverses the sea under a stranger flag, or sojourns on a foreign shore. It is not the citizenship of domicile; the citizenship, if you may call it so, of the man who comes to be a guest upon your shores, and who is entitled to protection, just as the stranger becomes a member of your household when you invite him to stay for the night. That is not the citizenship the act refers to; for that subjects to no liability whatever, beyond the territorial limits of the country in which the domicile is. Nor is it what some law books have called judicial citizenship; for that has no relation to a subject like this, but applies only to the question whether the party can sue or be sued in the courts of the United States, or whether their litigation must go over to the state courts. Nor, gentlemen of the jury, is it what some might call diplomatic citizenship, for want of a better term; that grade of inchoate citizenship which may be claimed by one who has declared his intention to become a citizen hereafter; prospective in its allegiance, actual in its asserted rights; about which diplomatists have disputed somewhat, but which I believe our courts have not yet recognized; such is not the citizenship meant by the act of congress. It is citizenship, such as yours and mine—that citizenship which makes us constituent members of this country, and that binds us everywhere to obey its laws, because it protects us everywhere. The right and the duty are inseparable. They begin and end together.

How then stands the question as to this prisoner? In the first place, it appears that he was a Frenchman by birth and language. Such were his own declarations if you believe the witnesses who have been examined before you. The declarations of a man after he is arrested for a crime, or when he is about to commit a crime, may be of very little value; and the man who, to prepare himself for going on a slaving voyage, had taken care to announce to the world that he was not an American, would gain very little advantage from his cautionary declarations. But if, at a time when he was not interested in disguising or denying his true national character, he had declared himself either a Frenchman or an American, having no object in falsifying the truth—not meditating the violation of a law which might subject him to punishment in case he were a citizen of one nation rather than of the other—if by common reputation, in the ordinary converse of his fellowmen, his nationality was recognized as in accordance with his declarations—presenting thus the same sort of evidence of his national character that I have of yours, that you have of mine, that we both have of

the gentlemen who surround us in this court—then surely his uncontradicted declarations are entitled to some credit. Just as in a question of pedigree; we speak of parentage and birthplace, on the authority of generally accepted opinion, which resolves itself at last into very little if anything else than the assertions of the party, or his household, or his neighbors. Seafaring men rarely travel with the family bible in their pockets.

If then, it be true, that this man did some fourteen or fifteen years ago arrive here, a Frenchman, apparently unable to speak English, that he did represent himself as born in France, that he did go to a French boarding house, that his associates were French, as this witness testified, that when he applied to one of them to get him a place on board a vessel, he was told it was useless for him to expect to get a place when he could not speak a word of English—having all this before us, and uncontradicted, we are to take him to have been a Frenchman or a foreigner fourteen years ago. If so, when or how did he become an American citizen? When was it? Where was it? We have had in the case of Mr. Machado, the proper proof by which the individual, foreigner by birth, is shown to be an American citizen now. The production of his letters of naturalization, and proof of his identity with the party named in them. We have had no such proof in regard to this man.

What then have we as a substitute? His assertion or admission that he had become one? Doubtful evidence, gentlemen, I may say to you. I should fear very much in a grave cause like this to determine upon the guilt of the prisoner, simply because he had said at a former time, that he was such a citizen as was amenable to our laws of the sea. I have seen too many of the oaths even, that pass through the custom house; I have seen too many good names signed to the papers that were received in that office as proofs of citizenship, and ownership, and identity of invoiced, with actual values, to be very anxious to begin the game of punishing capitally for a misrepresentation of fact at the custom house. Yet if a man has gravely asserted that he was an American citizen, still more if he swore that he was an American citizen, he cannot complain if we so far vindicate the principles of morality as to accept his oath for truth, until he gives us some better reason for believing that he lied. But in this case, did this defendant ever assert or admit that he was an American citizen? That he never carried a protection as an American citizen, as the district attorney has very truly observed, matters little; for very few American citizens carry protections now, and I trust the time may be very distant when they shall again be thought necessary.

But it is argued, that the custom house papers declare or rather assume the citizenship of this prisoner. If so, they would be of value just so far as he had been party to them, or

had recognized their correctness; and no further. Look then through all these documents, and say whether you find in them any assertion or recognition by the prisoner, of his being an American citizen. So far as I remember them, those papers from the custom house contained no proof at all as to the citizenship of the accused. In fact, the oath which the act of congress had required to be made, and which would have decided the question of his citizenship, so far as a custom house oath can attest anything, that oath prescribed by the act of congress, was for some years before this transaction, pretermitted as obsolete by the custom house at New York; and thus it happens there is no such oath taken by this accused, by which you can test the question whether he claimed to be a citizen or not. Then you have the crew list. So far as I remember that instrument, it is certified by a notary public that he received sufficient proof of the American character of the vessel, and of the crew named in the list itself. I may say to you gentlemen, that this certificate of that notary public, that he received sufficient proof, and his oath superadded to the instrument that he received such proof, are of little avail to the prosecution. It is this court, which has to judge of the legal relevancy of the proof; you are to judge of its sufficiency. But that crew list upon examining it, unless my recollection deceives me, does not contain any name by which it is alleged this prisoner has passed himself. There is, therefore, no admission, even supposing that he himself had made oath to the accuracy of the crew list, the oath being as to the American character of the vessel, and of the crew named in it. All these, however, like the other facts and circumstances which have been presented to you by the United States, are for you to consider of.

I have gone over two of the points; there is a third. If you are satisfied that the vessel belonged in whole or in part to American citizens, or that the prisoner was an American citizen; if you are satisfied that this prisoner was engaged on board as one of the ship's company, no matter whether as master or as mate, or as interpreter, or as doctor, if he was engaged on board in the prosecution of these acts, there remains still a point you are to be satisfied upon, of the intent on his part to reduce these people to slavery. I do not mean that it is a question whether this was really a slaving voyage or not; it seems to have been settled all around that it was a slaving voyage; but the character of the prisoner's intent as to the individuals who were on board is an essential topic of consideration by the jury. The seamen who shipped for the island of San Thomas, as probably supposing they were going to St. Thomas, in the West Indies, and who found out they were going to a little island on the coast of Africa, after they were on the high seas, bound to obedience by the maritime code, and exposed to peril and outrage if they refused;

such seamen cannot be said to have sailed with the intent to make or sell slaves.

We had a case of piracy before this court some years ago, which was presided over by my Brother GRIER, during the whole trial, and in which he made the charge. The evidence in some respects, not in a great many, but in some respects resembled that which has been before you. And I feel, that I shall do well to close the remarks I have to make upon this case by quoting some of the language of my eminent colleague. I adopt it entirely as my own; but I know that I shall secure for my own opinion greater weight by a reference to his. He said as follows:

"The United States can assume jurisdiction and a right to punish this offence committed on the high seas, only in consequence of the allegiance or citizenship of the offender, or because the act was done on board or by the crew or ship's company of a ship or vessel owned in whole or in part or navigated for or in behalf of a citizen or citizens of the United States. Hence it lies at the very foundation of this case, that the prosecution establish to your satisfaction the fact, either that the defendant is a citizen and owing allegiance to the United States and bound by her laws; or that not being such, the ship or vessel was owned in part or in whole by citizens. That the vessel assumed an American character abroad, is in evidence, that she was sent by the consul to an American port, that at Rio she applied to the American consul and held herself forth to the world as American; this affords a strong presumption of her American character, her national character. But it is not a necessary consequence therefrom that her owners were American citizens. Denizens or resident foreigners might have owned her. But then again, she sailed from New London as an American vessel. The testimony affords a strong probability that she was owned by Americans;—and as the testimony is wholly for your consideration, the court will not say that it is insufficient, if it be satisfactory to your minds.

"But the court think it their duty to observe, in a case of such awful and solemn consequences to the defendant, that the jury should be cautious how they deal with mere probabilities. What hindered the government from sending to New London, and bringing here the register, and the very owners themselves, to establish this fact beyond a doubt? Have they a right to call on you to convict on doubtful or probable testimony, when they had it in their power to have removed the doubt and furnished certainty instead of probability? Without wishing to interfere with your prerogative as to the facts, I venture to say that you would not be unreasonable if you required it at their hands."

In a word, gentlemen, I ask you to take the spirit of these remarks, and apply them to this case. When the United States call upon a jury to give a verdict of guilty, they are bound to prove the defendant's guilt of the

charge set forth in the indictment. Not. of course, by direct, irrefragable evidence—such evidence, where intent is an element of the crime, is rarely if ever possible—but by evidence which may satisfy the judgment and conscience beyond a reasonable doubt. You will not convict because you suspect; on the other hand, you will not refuse to convict, because you have doubts of legal policy, or sympathies that are to be shocked by a capital execution. You will answer upon the evidence before you, just as you would in a case that called for your cautious because responsible action, in the concerns of daily life, fearlessly, honestly, as men who have sworn to do justly between him and the state.

Mr. Vandyke asked the court to charge, that if the jury believe Marsden exercised the ordinary, usual acts of ownership in the fitting out of this vessel, these acts of his, being part of the res gestæ should be taken into consideration in determining the question whether the vessel was navigated for or on his account.

KANE, District Judge. They are so no doubt. Yet these acts on his part may be colored and explained by attendant circumstances. If Mr. Marsden acted as owner of this vessel in purchasing her, paying for her, repairing her, fitting her for sea, bargaining and paying for her ship's stores, procuring her pilot, all these are acts of ownership, and would certainly show that if he was not the owner, she was at least navigated on his behalf. But then if in direct connection with these acts of his, and running alongside of them, it be proved as fact, that the funds which he was using were the funds of a third person not a citizen, that he had no funds of his own, that he spoke of himself as a mere broker or agent, and was recognized as such by the banker who put him in funds, and by the third person whose funds they were; then, if all these be deemed true and not merely devices to disguise the truth, they would establish the fact of ownership in another, just as in a different aspect, they would be proof he was the owner of the vessel.

Verdict, not guilty.

### Incidental Points.

In the course of this trial, the following points, aside from the main case, occurred and were decided:

### First Point.

After the prisoner had pleaded not guilty, and a jury had been called, one of the jurors who was in delicate health, stated to the court, that certainly he would be unable to go through the cause without an attack of illness. The prisoner having exhausted his twenty challenges, the court, stating that it had no power to discharge a juror after he was once sworn, unless by consent of parties, suggested to the counsel that in view of the great inconvenience likely to arise, the record by consent might be so far falsified as to strike out the juror's name, and so as not to show that he had ever been called or sworn at all; and that the defendant should have the privilege of another challenge. That in this way both parties would be estopped from alleging the irregularity as matter of error. Being so recommended by the court, this course was agreed to by the counsel on both sides.

### Second Point.

When the prosecution had opened its case, and being about to go on with its evidence, had sworn a witness, the prisoner's counsel asked the court to instruct the witness and the other witnesses generally, before any of them were examined, and with a view to their own protection, that they were not bound to make any statements criminating themselves.

GRIER, Circuit Justice. We cannot do this. It would put it in the power of a witness by a mental reservation to tell only what he pleased, and to be the judge of what would criminate him, and the crimination might be moral, political or criminal. The court will interfere when necessary.

### Third Point.

To prove the reputed American character of the vessel on which the piracy alleged in the principal case was charged to have been committed, and the public declaration of her ownership by a citizen of the United States—such character and ownership being essential facts to sustain the indictment—the prosecution offered in evidence the vessel's original registry at the custom house in New York, promising to follow this proof up with other evidence of ownership. This registry, as is generally known, is made under an act of congress (Act of December 31, 1792 [1 Stat. 287]), declaring what vessels shall be "denominated and deemed vessels of the United States, entitled to the benefits and privileges appertaining to such vessels." It prescribes that before the registry can be made, the owners or one of them must swear or affirm that according to the best of his or their knowledge and belief, the vessel is owned wholly or in part by a citizen of the United States.

Objection being made by Mr. Guillou and Mr. Kane, who relied on U. S. v. Brune [Case No. 14,677], that case was distinguished by Mr. Vandyke, district attorney, for the United States, from this. because there the evidence was neither preceded nor to be followed up by any other evidence. It was the only evidence the prosecution relied on; and though offered as prima facie, was in truth relied on as conclusive. Here we shall follow the matter up by direct evidence of actual ownership. We wish to prove the history of this vessel from her build to the present day.

and these papers are offered as part of the history of the vessel, and as part of the record and title of the vessel. What they are worth will be hereafter a question. As part of the paper title of the vessel. and as showing through whose hands she has passed, and in whose hands she now is. they are at least competent.

GRIER, Circuit Justice. You can prove that these are the original custom house papers; and they may go to the jury as part of the case generally, and to show under what public character the vessel appeared and acted. What they are worth in law as evidence of actual ownership by a citizen of the United States, is matter to be considered hereafter.

### Fourth Point.

The custom house registry of ownership of the vessel, which was now in evidence, being found to be in the name of one Gray, who on those books thus appeared to be owner, and the prosecution alleging that. the name of Gray was a simulated one, which had been fraudulently assumed by some person in order to get the apparent ownership out of Marsden, a former registered, and still the real owner—the prosecution in order to prove the fraud, and that the name was thus simulated, now offered to prove by an expert that two different signatures on the registry, to wit, the signature to a bond, a crew bond, and a manifest which purported to be made, one by one person, and one by another, were in fact made by the same person under different names. But the prosecution had not proved, nor was it admitted by the defence, who had made either signature. The question put to the expert was, "Look at the signatures to the bond, to the crew bond, and to. the manifest, and say whether they are, to the best of your knowledge and belief, by the same person?"

Mr. Guillou objected to the question. Unless you have an acknowledged signature, or one proved by one who saw it signed, for comparison, you cannot bring in the evidence of a mere expert.

Mr. Vandyke. That is true in the case of a forgery. I know that there must then be a test paper by which the other signatures are to be proved. But I wish to show that the same man, whoever he be, signed the manifest, the oath, the crew bond and the register .bond; that they are all signed by one and the same person. If I offered this testimony for the purpose of showing that a certain A. B. signed those papers, then it would be necessary for me to have an admitted signature of A. B., in order to prove that he did sign them; my object now is only to prove the fact that the signatures on all the papers are by the same person.

Mr. Guillou, in reply. In a capital case any doubtful or dangerous evidence ought to be wholly excluded. It does not do to let evidence in to the jury, expecting that an antidote will come from the charge of the court. An effect in a criminal case is produced by the mere admission of evidence, and the charge cannot destroy this effect. How uncertain is the evidence of an expert on a question of this kind! If you would bring every expert from Maine to Louisiana, you would find one half of them would decide directly contrary to this witness on the stand. Nor has the counsel on the other side any right to open so wide a field for controversy; he is able. to produce any number of witnesses he may want on the subject, but the defendant who is a stranger here and a foreigner, has not the same means to do so.

GRIER, Circuit Justice. If the evidence were offered to prove that the prisoner had made both these signatures, it would be incompetent unless you had first an acknowledged or proven signature of the prisoner as a datum for a standard of comparison. Perhaps, indeed, it is only in cases of forgery where there is a similitude of handwriting, that such evidence is admitted at all. But here Mr. Vandyke is trying to prove external facts unconnected with the defendant. He has to show that the defendant did certain acts, that he went to Africa. He has not only to do that, but he must show more —he must show the national character of this vessel, her history, and a hundred other matters; and then her name painted on her stern. So, also, he gives the public register connected with her, showing the public character the vessel acted under. He then shows that a man by the name of Marsden is connected with her, and is the owner; that he paid her bills and fitted her out to go upon this voyage; that he had a bill of sale to her, and that he is a citizen; that under suspicious circumstances, there was a transfer made to a separate party, who, he alleges, is a man of straw—nobody at all— and in order to prove it so, wants to show that the signature of the captain and that of this party appear to be the same. done by the same hand. Now if that be a fact, would there not be some evidence in the case to show that it is so? He has put himself upon showing that this man is not the true owner; that there is a bill of sale made to him which is a mere sham; that it is made to nobody, and this is legitimate evidence in the case; not that it fixes this man as Darnaud, but that the transfer upon the record shows upon its face these two signatures were done by the same hand. Whether the signatures appear to be done by the same hand, that, I think, is a question you can put to an expert. Though the testimony is of rather a dangerous character, and not much to be relied on.